IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Addie D. Campbell, | ) | C/A No.  0:09-411-CMC-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| The School District of Chester County, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Through this action, Plaintiff, Addie D. Campbell  ("Campbell"), seeks recovery under

various federal statutes for alleged discrimination, hostile treatment, and retaliation in employment.

All of Campbell's causes of action relate to her employment with and termination from Defendant,

the School District of Chester County ("District").  *See infra* Causes of Action.

The matter is before the court on the District's motion for summary judgment on all claims.

For the reasons set forth below and in the Report and Recommendation of the Magistrate Judge, this

motion is granted in full.

**PROCEDURAL BACKGROUND**

In accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 (B)(2)(e), (g), DSC, this

matter was referred to United States Magistrate Judge Paige J. Gossett  for pre-trial proceedings and

a Report and Recommendation ("Report").  On December 10, 2010, the Magistrate Judge issued a

Report recommending that the District's motion for summary judgment be granted in full, resolving

all claims in the District's favor.  Dkt. No. 48.

The Magistrate Judge advised the parties of the procedures and requirements for filing

objections to the Report and the serious consequences if they failed to do so. Campbell timely filed

an Objection on January 7, 2011.  Dkt No. 49.

In her Objection, Campbell expresses agreement with the procedural history as laid out in the Report, but states that she "objects and disagrees [with] the facts and the underlying reasoning of the adverse employment actions taken against her as presented by the Defendant." Dkt. No. 49 at 1. While expressing disagreement with *the District's* actions and presentation of facts, Campbell does not direct the court to any misstated fact as set forth in the *Report*. Nonetheless, she "objects to the Magistrate's findings that she has not established a valid claim of race discrimination." *Id.* Campbell's more specific objections are addressed below.

## STANDARD

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the court. *See Mathews v. Weber*, 423 U.S. 261 (1976). The court is charged with making a *de novo* determination of any portion of the Magistrate Judge's Report and Recommendation to which a specific objection is made. The court may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate Judge or recommit the matter to the Magistrate Judge with instructions. *See* 28 U.S.C. § 636(b). In the absence of an objection, the court reviews the Report and Recommendation only for clear error. *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 315 (4th Cir. 2005) (stating that "in the absence of a timely filed objection, a district court need not conduct a *de novo* review, but instead must only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation") (citation omitted).

## CAUSES OF ACTION

At least one of Campbell's objections raises questions as to what claims were addressed by the District's motion. The court begins, therefore, with a summary of the complaint which purports

to advance three distinct causes of action, though there is substantial overlap between the three counts.

**First Cause of Action.** The first cause of action is denominated as a claim for violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII") but also purports to rely on 42 U.S.C. § 1981. Complaint ¶¶ 26-27. The District and the Report address this cause of action as if also pursued under 42 U.S.C. § 1983 (which the District argues is a more appropriate basis for such a claim). For purposes of this order, this court presumes the first cause of action relies on all three statutory bases.

Through this cause of action, Campbell seeks recovery for termination on the basis of race and also alleges that she was subjected to "unwanted treatment, harassment and retaliation" based on race. Complaint ¶¶ 27-28; *see also id.* ¶ 31 (referring to "hostile work environment"). In light of the preceding factual allegations, the court presumes that the discriminatory or retaliatory treatment at issue relates to claims that a Caucasian co-worker "refused to take orders from Plaintiff" (¶13) and that this employee, her husband (also a Caucasian employee of the District) and other Caucasians in management positions "obstruct[ed] Plaintiff's supervision" over the Caucasian co-worker and otherwise attempted to "oust Plaintiff from the position of Team Leader [through] false accusations[.]" The nature of the false accusations is not specified unless it relates to "an incident that happened during a Band Festival on April 28, 2007," and subsequent related meetings which Campbell addresses in some detail. Complaint ¶¶ 15-22. Campbell asserts that the other employee involved in this incident (the Caucasian band director) initially informed Campbell that he heard Campbell would be terminated because of the April 28, 2007 incident. Campbell does not, however, allege that any disciplinary action was taken against her as a result of the April incident, although

3

she does allege that she was required to participate in meetings relating to the incident (which did not result in disciplinary action).[1]

**Second Cause of Action.**  The second cause of action is denominated as a claim for retaliation without specification of any statutory basis. Campbell alleges, without further specificity, that she "repeatedly objected to and protested the violations of her federally protected rights within the District's administrative structure and later, to the South Carolina Human Affairs Commission ['SCHAC'] and United States Equal Employment Opportunity Commission ['EEOC']." Complaint ¶ 38. Although she is not specific as to what retaliatory actions were taken, she presumably relies on her termination given her damage demand for, *inter alia*, lost wages.

Other than her post-termination filings with SCHAC and the EEOC (Complaint ¶ 9), which cannot serve as motivation for any pre-termination retaliation, Campbell does not identify any specific protected activity.  Nonetheless, the court will assume from Campbell's discussion of the April incident in which she "expressed her concern to the Defendant that they took no remedial action against [the band director], who is a Caucasian employee," that Campbell relies on this expression of concern as a pre-termination protected activity.[2]

**Third Cause of Action.**  The third cause of action is denominated a claim for hostile work environment and expressly relies on Title VII and "42 U.S.C. Sec. 1081."   In light of other

---

[1]  The only adverse employment action against Campbell appears to have resulted from accusations made later in the year. *See* Complaint ¶ 23 (referring to meeting in August "to discuss some fictitious accusations reported by co-workers and staff" in which plaintiff was advised "it would be in her best interest to be transferred"); *id.*¶ 24 (alleging the Human Resources director "seized on [this] opportunity to terminate Plaintiff"). Even if an inference is drawn that the termination resulted from the combined effects of the April incident and later accusations, it is only the termination which constitutes an adverse employment action.

[2]  Campbell does not specify to whom she expressed these concerns or whether her concerns were expressed as a complaint of disparate treatment based on race.

4

arguments and earlier references, the court presumes the latter is a typographical error and that

Campbell intended to rely on 42 U.S.C. § 1981.  As with her retaliation claim, Campbell offers no

specificity as to what events or conditions gave rise to a hostile environment.  Instead, she states that

the "retaliation, harassment and hostile work environment" she experienced during her employment

constitute a  "violation of [a] clear mandate of public policy of the State of South Carolina" as well

as violation of the specified federal statutes.  Complaint ¶ 41.  Campbell seeks lost wages and

emotional distress and related damages under this cause of action.  Complaint ¶¶ 42-43.

## DISCUSSION

**Disparate Treatment.**  As noted above, although other wrongs are referenced (retaliation

and hostile environment), the focus of Campbell's first cause of action is a claim for disparate

treatment.[3]  This claim is expressly pursued under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"); and under 42 U.S.C. § 1981.  For purposes of this

order, the court also assumes that Campbell seeks relief under 42 U.S.C. § 1983 to the extent it,

rather than Section 1981, may provide the more appropriate foundation for a claim of racial

discrimination against a public entity.[4]

The factual allegations set out in advance of this claim and damages sought through it

suggest the focus of this claim is on Campbell's termination in August 2007.  The allegations

relating to earlier events, including one Caucasian employee's refusal to take orders from Campbell,

other Caucasian employees' interference with Campbell's claimed supervisory authority over that

employee, and the events revolving around the April 2007 incident, at most, suggest improper

---

[3] As explained above, Campbell included distinct claims for hostile environment and retaliation.  The court, therefore, considers those claims separately and treats reference to such wrongs in the first cause of action as surplusage.

[4] In light of the basis for its grant of summary judgment, the court need not decide whether Section 1981 or 1983 provides the more appropriate basis for Plaintiff's claim.

motivation for her later termination.[5]  Nonetheless, as did the Magistrate Judge, the undersigned

gives Campbell the benefit of the doubt and assumes she also seeks relief for pre-termination

disparate treatment through this cause of action.

**Termination.**  The Report recommends that the District's motion be granted to the extent

Campbell alleges her termination was racially motivated because she has failed to present sufficient

evidence to support two prongs of her *prima facie* case: that she was meeting her employer's

legitimate expectations at the time of her termination; and that the position remained open or was

filled by a similarly qualified individual outside the protected class.

Campbell argues the first conclusion is in error because the primary concern with her

performance related to her interpersonal skills and the supervisor who recommended Campbell be

transferred (school principal H.L. Erwin ("Erwin")), conceded he personally did not have trouble

working with Campbell.[6]  Dkt. No. 49 at 3 (citing Erwin dep. at 86, 98).  Campbell also relies on a

co-worker's testimony that he had never seen Campbell act unprofessionally.  *Id.* (citing  Crockett

dep. at 15, 21, 37).

These arguments miss the mark. First, the concerns with Campbell's professionalism and

interpersonal skills related to her interactions with co-workers, teachers, students, and others.  *See*

Report at 7; Dkt. No. 34-2 (Erwin August 10, 2007 letter addressing concerns and stating his request

that Campbell be transferred to a different school).  They did not relate to her interactions with

---

[5] Campbell's allegations that others disregarded or interfered with her supervisory authority
are defeated by undisputed evidence that Campbell lacked such authority.  Campbell dep. at 21
(explaining that she served as a "team leader" which included greater responsibilities than other
employees but did not make her a supervisor);  Willie Jones aff. ¶5 (avering that Campbell lacked
authority to supervise or give orders to other employees).

[6] As explained below, Erwin's recommendation that Campbell be transferred led to a
meeting which, in turn, resulted in Campbell's termination.

Erwin, who noted that, despite her interpersonal difficulties, Campbell was "probably the best at getting the job done." Dkt. No. 34-2 at 2 (Erwin letter). Thus, any statement by Erwin that he personally did not have problems dealing with Campbell does not contradict evidence that he recommended Campbell be transferred because she was failing to meet his legitimate expectations as to professionalism and interpersonal skills.[7] Similarly, the statement of a single co-worker that he never saw Campbell act in an unprofessional manner does not mean that others, most critically Erwin and others higher up the supervisory chain, had not observed or received reports of such behavior. Thus, this evidence does not raise a genuine issue of material fact as to whether Campbell was meeting her employer's legitimate expectations. *See* Report at 8.

Moreover, the decision to terminate Campbell rather than to transfer her (as recommended by Erwin) followed an August 13, 2007 meeting between Campbell and the Executive Director of Human Resources, Rita Stringfellow and others. Dkt. No. 34-3 (termination letter dated August 17, 2007). That meeting, which was requested by Campbell, led Stringfellow to recommend termination based on Stringfellow's conclusions as to Campbell's "lack of tact, poor interpersonal skills and uncooperativeness in dealing with coworkers, [and] other employees." *Id.* at 2; Campbell dep. at 95. In her deposition, Campbell characterized the meeting differently than did Stringfellow and now suggests that Stringfellow may have drawn the wrong conclusions from the reports she received. Campbell has not, however, directed the court to any evidence that Stringfellow's actual opinion of

---

[7] Campbell refers to testimony from Erwin's deposition in which he concedes that, as principal and because of his personality, he had a good relationship with Campbell. Erwin dep. at 98. However, he also refers to complaints from staff that Campbell would "fuss at them, berate them and that sort of thing." *Id.*; *see also id.* at 85 ("We had a good relationship. If I asked her to do something, she would do it. But, again, not with me but with other people she had some problems."); *id.* at 85-86 (referring to "bickering" between Campbell and three other employees).

Campbell's interpersonal skills was not as represented in the letter.[8] Moreover, although Campbell would attribute the cause of the difficulties to others, she concedes that she experienced conflict with a number of co-workers and that some negative reports were made about her to Erwin and others. *E.g.*, Campbell dep. at 24-28, 48-49, 58-62.   Thus, viewed from the perspective of the employer, the evidence establishes that Campbell was not meeting her employer's reasonable expectations. *See* Report at 6 (discussing *Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 30 (2d Cir. 1997)).

Campbell's arguments as to the fourth prong of her *prima facie* case likewise fail for reasons set forth in the Report.  For example, Campbell has failed to proffer evidence that the relevant decisionmaker(s) had knowledge of her claim of race discrimination at the time her replacement (also African American) was hired.  Consequently, she cannot establish an exception to the general rule that she must show she was replaced by someone outside the protected class.

As the Report notes, the above conclusions defeat Campbell's ability to make out a *prima facie* case that she was terminated based on her race, regardless of the statutory basis of her claims. They also preclude Campbell from demonstrating that the legitimate, nondiscriminatory reasons

---

[8] In her letter setting forth the reasons for Campbell's termination, Stringfellow recounted reports she received regarding Campbell's inappropriate interactions with others, as well as her own prior dealings with Campbell.  The latter included emotional phone calls from Campbell complaining about the behavior of others and a "discourteous letter" sent to Stringfellow after an earlier meeting.  Stringfellow also described the August 13, 2007 meeting as ending with Campbell"[standing] up crying and shout[ing] at me a couple of times, 'All I want to know is am I fired.  Just tell me that.  Do I have a job[?]'" Dkt. No. 34-3.  Although Campbell testified that she did not, as Stringfellow suggested, behave rudely in her departure from the meeting, she concedes that, during the meeting, Stringfellow raised concerns regarding Campbell's lack of tact, unprofessionalism and inability to get along with others.  Campbell dep. at 101.  Campbell also concedes that she cried and asked if she was being fired.  *Id.*  Despite the differences in characterization of the meeting, both Stringfellow and Campbell described a stormy meeting in which Stringfellow recounted concerns consistent with those ultimately given for the termination. While Campbell's testimony may suggest that Stringfellow drew the wrong conclusions from the meeting and prior events, it does not support an inference that Stringfellow's opinions, as expressed in the meeting and termination letter, represented anything other than her honest evaluation of Campbell's behavior.

given for the termination were pretextual, even assuming Erwin and Stringfellow erred in believing the truth of third-party reports of Campbell's behavior.

**Discipline.**  To the extent Campbell seeks relief for disparate discipline short of termination, her cause of action fails for the reason set forth in the Report.  Most critically, Campbell has failed to direct the court to evidence that she was actually subjected to any disciplinary action (distinct from her termination).  *See* Report at 14-15.  At most, she was admonished or scolded for allowing parents to use the kitchen area of the cafeteria during a band event.  This is not disciplinary action which would rise to the level of an adverse employment action.

In her Objection, Campbell argues that the Report improperly addressed this argument because it was not addressed in the District's motion.  The court disagrees.  The District moved for summary judgment on all causes of action.  To the extent Campbell asserts any claim for disparate discipline, it is included within her first cause of action which, nonetheless, focuses on her termination (the only adverse employment action suggested by the record).   Under these circumstances, it is proper to consider the viability of any claim for disparate discipline.

For the reasons set forth above and in the Report, the content of which is adopted and incorporated herein, the court grants District's motion for summary judgment on Campbell's disparate treatment claims whether pursued under Title VII, Section 1981, or Section 1983.  This ruling covers any claim for discriminatory termination or earlier disciplinary action.

**Hostile Environment and Retaliation.**  The court, likewise, finds no merit in Campbell's objections to the Report's recommendations that the District's motion be granted as to the claims

9

for hostile environment and retaliation.  As to these claims, the court adopts the Report's rationale and recommendation.[9]

## CONCLUSION

For the reasons set forth above, the court adopts and incorporates the rationale and recommendation of the Report, and grants the District's motion for summary judgment in full. Judgment shall be entered accordingly.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
January 19, 2011

---

[9]  Though it is neither a concern raised in Campbell's objection nor determinative in this case, the court clarifies one point in the Report's discussion of the retaliation claim:  To establish a claim of retaliation Campbell need only prove that she suffered some adverse action that a reasonable employee would have found materially adverse, meaning it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. *See Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53, 67-68 (2006).  Although the Fourth Circuit has, subsequent to *Burlington Northern*, continued to refer to the second element as requiring proof of an "adverse *employment* action," the adverse action need not be directly related to employment. *See Burlington Northern*, 548 U.S. at 67 ("The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."); *Wells v. Gates*, 336 Fed. Appx. 378 (4th Cir. 2009) (referring to second element as requiring proof of an "adverse employment action" but otherwise relying on the more flexible standard established in *Burlington Northern*); *see also* Report at 10 (referring to a requirement for proof of an "adverse employment action").  The distinction is of no moment in the present case, however, because the grant of summary judgment is based on the absence of evidence of any protected activity predating termination.